GALLO LLP
Ray E. Gallo (State Bar No. 158903)
rgallo@gallo-law.com
Dominic Valerian (State Bar No. 240001)
dvalerian@gallo-law.com
1299 4th St., Ste. 505
San Rafael, CA 94901
Phone: (415) 257-8800
Fax: (415) 257-8844

BARON & BUDD, P.C.
Daniel Alberstone (State Bar No. 105275)
dalberstone@baronbudd.com
Roland Tellis (State Bar No. 186269)
rtellis@baronbudd.com
Mark Pifko (State Bar No. 228412)
mpifko@baronbudd.com
15910 Ventura Blvd., Suite 1600
Encino, CA 91436
Phone: (818) 839-2333
Fax: (818) 986-9698

Attorneys for Plaintiff Diversified Capital Investments, Inc.

## THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DIVERSIFIED CAPITAL INVESTMENTS, INC., on behalf of itself and all others similarly situated,<br><br>      Plaintiff,<br><br> v.<br><br>SPRINT COMMUNICATIONS, INC.; NEXTEL COMMUNICATIONS, INC.; NEXTEL OF CALIFORNIA, INC.; and DOES 1 through 100, inclusive,<br><br>      Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF:**<br><br> **1. BREACH OF CONTRACT**<br><br> **2. DECLARATORY RELIEF**<br><br>  **DEMAND FOR JURY TRIAL** |

Plaintiff Diversified Capital Investments, Inc., acting for itself and for all others similarly situated, alleges as follows. The allegations herein that relate to Plaintiff's actions are based on personal knowledge. The balance are made on information and belief.

**The Parties**

1.      Plaintiff Diversified Capital Investments, Inc. ("DCI" or "Plaintiff") at all times mentioned herein was a California Corporation with its principal place of business at 1299 Fourth Street, Suite 202, San Rafael, California 94901. DCI is a party in this case because it is the assignee of claims originally held by Diversified Equity Holdings, L.P. ("DEH") against Defendants.

2.      Defendant Nextel of California, Inc. ("Nextel of California") is a Delaware corporation with its principal place of business in Overland Park, Kansas. Nextel of California is a wholly owned subsidiary of Defendant Nextel Communications, Inc., which is itself a wholly owned subsidiary of Defendant Sprint Communications, Inc.

3.      Defendant Nextel Communications, Inc. ("Nextel") is a Delaware corporation with its principal place of business in Overland Park, Kansas.

4.      Defendant Sprint Communications, Inc. ("Sprint Communications"), formerly known as Sprint Nextel Corporation, is a Kansas corporation with its principal place of business in Overland Park, Kansas. (Defendant Sprint Communications and all of its direct or indirect subsidiaries, including Nextel and Nextel of California, are collectively referred to herein as "Sprint".)

5.      Defendant Sprint Communications is liable for the acts of Defendants Nextel and Nextel of California alleged in this complaint as their alter ego. Recognition of the of the privilege of separate existence would promote injustice because Defendant Sprint Communications organized and controlled Defendants Nextel and Nextel of California so that they are now, and at the time of the wrongdoing alleged in the complaint were, merely an instrumentality, agency, conduit, or adjunct of Defendant Sprint Communications. Defendant Sprint Communications exercises complete dominion and control over Nextel and Nextel of

California, enjoys the full benefit of all moneys and profits they earn, and dictated and caused all of their wrongful actions alleged in this complaint.

6. The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants named herein as DOES 1 through 100, inclusive, are unknown to Plaintiff. Each such fictitiously named Defendant is in some manner legally responsible for the wrongs and damages alleged herein. Plaintiff will amend the complaint to identify them when their true names and capacities have been ascertained.

7. Each of the Defendants sued herein, whether named or named fictitiously, was the agent and/or employee, co-venturer, partner, surety, or in some manner the agent, principal, or joint or co-venturer, of one or more of the other Defendants, and was acting within the course and scope of said agency, representation, employment, or joint or co-venture in doing or failing to do as alleged herein. The acts and conduct alleged herein of each Defendant were known to, and authorized and ratified by each and every remaining Defendant.

**Jurisdiction And Venue**

8. This Court has subject matter jurisdiction over this putative class action pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005 ("CAFA"), because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which some members of the Class are citizens of states different than Defendants. *See* 28 U.S.C. § 1332(d)(2)(A). Therefore, both elements of diversity jurisdiction under CAFA are present, and this Court has jurisdiction.

9. This Court has personal jurisdiction over Defendants because they conduct substantial business throughout California.

10. Venue lies in this district pursuant to 28 USC § 1391(b)(2) because a substantial part of the events that give rise to Plaintiff's claims occurred in this district.

**Factual Background**

11. Nextel was a wireless service operator that maintained a national wireless communication network. Nextel's network was based on Integrated Digital Enhanced Network

("iDEN") technology, which supports normal cell phone voice communications, data services, messaging, and Nextel's signature push-to-talk walkie-talkie feature.

12.     Nextel's communications network was comprised of tens of thousands of cell sites, which consist of mobile telecommunications antennae, equipment, cables, batteries, wires, and accessories. In order to procure property for its communications network, Nextel, through wholly owned subsidiaries like Nextel of California, entered substantially similar lease agreements ("Nextel Cell Leases") with various legal and natural persons including businesses, governmental units, individuals, corporations, partnerships, and other entities.

13.     DEH owns the office building located at 1299 Fourth Street, San Rafael, CA 94901 ("1299 Fourth Street"). On or about March 31, 1998, DEH entered into a Nextel Cell Lease (the "Lease") with Nextel of California to lease it space on the fifth floor and roof of 1299 Fourth Street for a cell site (the "Leased Premises"). Section 9 of the Lease provided that the Leased Premises would be used "for the purpose of operating a wireless radio telecommunications mobile telephone system." The Lease commenced on or about December 31, 1998 and was to run for ten years unless sooner terminated as provided therein. A copy of the Lease is attached hereto as Exhibit 1 and incorporated herein by this reference.

14.     In 2005, Nextel merged with and became a wholly owned subsidiary of Sprint Corporation, which itself became Sprint Nextel Corporation.

15.     On July 24, 2008, Sprint extended the initial term of the Lease for an additional period of ten years, through December 31, 2018. A copy of the letter by which the Lease was extended is attached hereto as Exhibit 2 and incorporated herein by this reference.

16.     In the fourth quarter of 2010, Sprint announced plans to phase out its iDEN Network in 2013. On May 29, 2012, Sprint announced that it planned to cease service on the iDEN Network as early as June 30, 2013. On June 30, 2013, Sprint discontinued the iDEN Network as scheduled, taking nearly 30,000 cell sites off the air. Following the iDEN Network's shutdown, in July 2013 Sprint Nextel Corporation changed its name back to Sprint Communications, Inc.

17.     By letter dated September 9, 2013 Sprint purported to give DEH notice that it was terminating the Lease pursuant to Section 12(b), effective the earlier of April 30, 2014, or the date that it vacated the site. A copy of this letter is attached hereto as Exhibit 3 and incorporated herein by reference.

18.     Section 12 of the Lease provides in relevant part:

> 12. <u>Termination</u>
>
> Tenant shall have the right to terminate this Lease upon any of the following events:
>
> …
>
> (b)     If Tenant determines at any time that the Leased Premises are not appropriate under Tenant's design or engineering specifications for its Communication Facility or the communications system to which the Communication Facility belongs.

As used in the Lease, "Tenant" means Nextel of California; "Leased Premises" means the specified portion of 1299 Fourth Street; and "Communications Facility" means "the antennas and all of Tenant's equipment, cables, batteries, wires, and accessories." Ex. 1 (Lease) at Preamble, § 1.

19.     Section 12(b), by its express terms, only permits Sprint to terminate the Lease if it determines that the Leased Premises are not appropriate, under its "*design or engineering specifications*," for either: a) its "Communication Facility" or b) the "the communication system to which the Communication Facility belongs." All of the Nextel Cell Leases contain a materially identical termination provision.

20.     Sprint did not make any determination that the "design or engineering specifications" of the Leased Premises were not appropriate for its Communications Facility or the communication system to which the Communications Facility belongs. Indeed, the design and engineering specifications of the Leased Premises were just as appropriate before Sprint chose to unilaterally discontinue the iDEN Network as they were after the iDEN Network shutdown. Sprint's unilateral decision to discontinue the iDEN Network was a business decision and had nothing to do with whether the Leased Premises' design or engineering specifications were inappropriate, as required by Section 12(b) of the Lease Agreement. As Sprint did not

bargain for the right to terminate the Lease if while the site remained suitable as a Communications Facility, or for its economic benefit or its convenience, it cannot terminate the Lease on that basis under Section 12(b) or any other provision.

21. On or about April 30, 2014, Sprint stopped paying DEH rent under the Lease. Despite DEH's best and diligent efforts, it has been unable to re-lease the Premises and has consequently lost and is losing rental income in the amount of at least $4,157.86 per month since April 30, 2014.

22. Sprint improperly purported to terminate, and ceased performance on, thousands of other Nextel Cell Leases on the same factual and contractual basis.

23. Section 34 of the Lease provides that "[i]n any action or proceeding instituted by either party for the purpose of determining or enforcing rights hereunder, the prevailing party shall be entitled to recover all expenses reasonably incurred, including court costs and reasonable attorney fees as determined by the court."

24. Section 47 of the Lease provides "[a]ny monetary obligations of Tenant which are unpaid for more than ten (10) days from the date due shall be subject to a late charge of five percent (5%) of the amount overdue. All sum not paid within thirty (30) days after the due date shall bear interest on said amount from the date due until paid, at the rate of twelve percent (12%) per year."

25. DEH assigned its claims against Defendants to DCI, which provides building management services to DEH for properties, including 1299 Fourth Street. DCI accepted the Assignment.

## Class Action Allegations

26. Plaintiff brings this class action lawsuit pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of all members of the following Class:

> All natural and legal persons who leased space within California to Sprint or its predecessor Nextel, or any of their direct or indirect subsidiaries, for a cell site, whose lease Sprint purported to terminate based on the following lease provision or a materially identical one:

Tenant shall have the right to terminate this Lease upon any of the following events:

…

(b)    If Tenant determines at any time that the Leased Premises are not appropriate under Tenant's design or engineering specifications for its Communication Facility or the communications system to which the Communication Facility belongs.

27.    Excluded from the Class are the following individuals and/or entities: Sprint and its parents, subsidiaries, affiliates, officers and directors, current or former employees, and any entity in which Sprint has a controlling interest; all individuals and/or entities who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

28.    Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

29.    Class certification is appropriate under Rule 23(b)(2) because Defendants have acted on grounds uniformly applicable to Plaintiff and the Class. Class certification is appropriate under Rule 23(b)(3) because this action satisfies the applicable numerosity, ascertainability, commonality, typicality, adequacy, predominance, and superiority requirements.

30.    The Class is so numerous that joinder is impractical. Sprint reportedly terminated 30,000 cell site leases nationwide. On that basis, Plaintiff estimates that the Class consists of at least several thousand members. Class members' identities can be ascertained from Sprint's records, including but not limited to the estimated 30,000 leases.

31.    Plaintiff's claims are typical of the claims of the Class: all Class members' Nextel Cell Leases contain materially identical termination provisions; Sprint purported to terminate and/or terminated each Class member's Nextel Cell Lease on the same factual and contractual basis; each Class member's "Leased Premises" were in fact appropriate under Sprint's design and engineering specifications for Sprint's "Communications Facility" and the "communications system to which the Communication Facility belongs;" Sprint breached each Class member's Nextel Cell Lease by ceasing to pay rent before the term expired. Plaintiff and Class Members

1   are entitled to declaratory relief and damages as a result of the conduct complained of herein.

2   Plaintiff has no individual interests antagonistic to the claims of the class.

3       32.     Questions of law and fact common to all members of the Class predominate over

4   any potential individual questions. Important common question of law and fact include:

5       a.      Whether Sprint was entitled to terminate Class members' leases prematurely;

6       b.      Whether Sprint breached the express or implied terms of Class members' leases

7               when it: a) stopped paying rent, and b) purported to terminate their leases;

8       c.      Whether Sprint's attempts to terminate Class members' Nextel Cell Leases should

9               be declared invalid;

10      d.      Whether Class members are entitled to recover damages as a result of Sprint's

11              conduct; and

12      e.      Whether Class members are entitled to an award of reasonable attorney's fees,

13              pre-judgment interest, and costs of this suit.

14      33.     A class action is superior to other available methods for the fair and efficient

15  adjudication of this controversy because joinder of all members is impracticable and the

16  likelihood of individual Class members prosecuting separate claims is remote. Relief concerning

17  Plaintiff's rights under the laws alleged herein and with respect to the Class as a whole is

18  appropriate. Plaintiff knows of no difficulty to be encountered in the management of this action

19  that would preclude its maintenance as a class action.

20      34.     Plaintiff's attorneys are well qualified, experienced, and capable in the field of

21  class action litigation. They have successfully prosecuted claims in other, similar litigation.

22      35.     There is a well-defined community of interest among the members of the Class

23  because common questions of law and fact predominate, Plaintiff's claims are typical of the

24  members of the Class, and Plaintiff can fairly and adequately represent the interests of the Class.

25

26  <div align="center">**First Claim**
**(Breach of Contract)**</div>

27      36.     Plaintiff incorporates by reference each of the preceding paragraphs as though

28  repeated here.

<div align="center">7
COMPLAINT</div>

37. DEH and Class members each entered Nextel Cell Leases, which constitute valid and binding contracts between them and Sprint.

38. DEH and Class members fully performed under Nextel Cell Leases.

39. Sprint breached the Nextel Cell Leases of DEH and each Class member when it: a) stopped paying rent, and b) purported to terminate their leases.

40. DEH and Class members have suffered damages as a result of Sprint's breach, including but not limited to lost rent, costs associated with re-leasing the leased premises, and attorney's fees.

### Second Claim
**(Declaratory Relief)**

41. Plaintiff incorporates by reference each of the preceding paragraphs as though repeated here.

42. An actual controversy has arisen regarding Sprint's unilateral decision to cease performing under (and purport to terminate) the Nextel Cell Leases.

43. Plaintiff and the Class contend that Sprint was not contractually entitled to terminate DEH and Class members' Nextel Cell Leases prematurely.

44. Sprint contends that it was contractually entitled to terminate DEH and Class members' Nextel Cell Leases prematurely pursuant to Section 12(b).

45. Because of the controversy that exists among the parties, a declaration of the rights and responsibilities of the parties is necessary. Specifically, Plaintiff seeks a declaration from the Court that Sprint was not contractually entitled to terminate the Nextel Cell Leases.

### PRAYER FOR RELIEF

**WHEREFORE** Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

FIRST CLAIM FOR BREACH OF CONTRACT:

1. For damages according to proof;

2. For both pre- and post-judgment interest on any amounts awarded pursuant to contract and all applicable laws; and

3. For attorney's fees and expenses pursuant to contract and all applicable laws.

SECOND CLAIM FOR DECLARATORY RELIEF:

1. For a declaration that Sprint was not contractually entitled to terminate the Nextel Cell Leases prematurely; and

2. For attorney's fees and expenses pursuant to contract and all applicable laws.

ON ALL CLAIMS:

1. For costs of suit; and

2. For such other and further relief as the Court deems just and proper.

**Respectfully submitted,**

DATED: August 19, 2015                   GALLO LLP
                                        BARON & BUDD, P.C.


                                   By:   /s/ Dominic Valerian
                                        Dominic Valerian
                                        Ray E. Gallo
                                        Roland Tellis
                                        Attorneys for Plaintiff Diversified Capital
                                        Investments, Inc.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial of all claims so triable.

**Respectfully submitted,**

DATED: August 19, 2015                    GALLO LLP
                                          BARON & BUDD, P.C.


                                   By:   /s/ Dominic Valerian
                                             Dominic Valerian
                                             Ray E. Gallo
                                             Roland Tellis
                                         Attorneys for Plaintiff Diversified Capital
                                         Investments, Inc.

## BUILDING LEASE AGREEMENT

This Building Lease Agreement ("Lease") is entered into this 31 day of March 1998, between NEXTEL OF CALIFORNIA, INC., a Delaware corporation, d/b/a Nextel Communications, ("Tenant"), and DIVERSIFIED EQUITY HOLDINGS L.P., a California Limited Partnership ("Landlord").

On the terms, provisions, and conditions hereinafter set forth and in consideration of mutual covenants and obligations of the parties hereunder, the parties agree as follows:

1.    <u>Premises</u>

Landlord is the owner of a building (the "Building") located on that certain real property in the City of San Rafael, County of Marin, State of California, commonly known as 1299 4ᵗʰ Street (Diversified Financial Centre), ("Landlord's Property") and more particularly described in Exhibit "A" to this Lease. Landlord hereby leases to Tenant and Tenant hereby leases from landlord, in "as – is" condition, a portion of Building ("Leased Premises") which is approximately two hundred (200) square feet of space on the fifth floor (Suite 504) together with the space for installation, maintenance and operation of up to twelve (12) wireless antennas on the roof of the Building, along with the right to place cables from the antenna locations to the area housing Tenant's electronic equipment together with all easements and appurtenances in connection therewith. For the purpose of this lease, the antennas and all of Tenant's equipment, cables, batteries, wires, and accessories shall hereafter collectively be referred to as "Communications Facility". Nothing contained herein shall preclude Landlord from leasing or licensing space on Landlords Property to other communications companies, provided however, their installations and operations do not interfere with Tenant's Communication Facility.

The Leased Premises are more particularly described in the preliminary site plan attached hereto as Exhibit "B".

2.    <u>Tenant Improvements</u>

Prior to commencing construction, Tenant shall obtain Landlord's approval of Tenant's plans for Tenant's construction work, which approval shall not be unreasonably withheld, delayed or conditioned. Landlord shall give such approval or provide Tenant with its requests for changes within ten (10) business days of Landlord's receipt of Tenant's plans. If Landlord does not provide such approval or request changes within such ten (10) business day period, it shall be deemed to have approved the plans. Landlord shall not be entitled to receive any additional consideration in exchange for giving its approval of Tenant's plans.

Tenant shall obtain all building permits, zoning changes and/or approvals, collectively called "Permits", necessary for the construction, operation, and maintenance of the Communications Facility. Landlord agrees to fully cooperate with Tenant in obtaining the Permits, and without limiting the generality of the foregoing, to execute any applications, maps, certificates, or other documents that may be required in connection with the Permits.

3.    <u>Preparation of Leased Premises</u>

      (a)      After receipt of the approvals referred to in Section 2 above, Tenant shall engage the service of licensed contractor(s) to construct the Communications Facility. Tenant shall be permitted to utilize contractors of Tenant's choice and Landlord shall have the right to review and approve said contractor(s), provided said approval shall not be unreasonably withheld, delayed or conditioned. Any Tenant Improvement work that will create unreasonable noise or other disturbance at a level that interferes with existing tenants' use of the Building shall be performed after 6:00 P.M. and before 7:00 A.M. or on Saturday, Sunday, or a holiday.

      (b)      Tenant shall pay the cost of construction of the Communications Facility, and shall keep the Leased Premises free and clear of liens incurred by Landlord arising out of work performed on the Leased Premises by Tenant.

4.    <u>Fixtures</u>

At the expiration or termination of this Lease Tenant shall remove from the Leased Premises all trade fixtures, including all rack mounted radio and support equipment including, without limitation, radio base station, channel banks, Duplexers, batteries, Unistrut system, Telco panel, rectifiers, telephones, fire suppression system, HVAC system, ducting, cables, wires, and

Exhibit 1

connectors. After such removal, at Tenant's sole cost, Tenant shall restore the Leased Premises as near as practicable to the condition in which it existed upon execution hereof save and except normal wear and tear and acts beyond Tenant's control.

5.    Pre-Term Possession

Prior to the Commencement Date as set forth in Section 6(a) below, Tenant may enter the Leased Premises for such purposes as Tenant may have to prepare plans, inspect the Leased Premises, install supplies, inventory and other property. Tenant shall be accompanied by Landlord during any such entry, and such entry shall not in any way interfere with the progress of any Landlord work in the Leased Premises or Building.

Any such early occupancy by Tenant hereunder shall not operate to commence the initial term of this Lease herein above provided. Tenant specifically agrees to indemnify Landlord for any and all occurrences within or about the Leased Premises arising from or caused by such early occupancy by Tenant and to reimburse Landlord upon written demand for any extra utility costs or charges incurred by Landlord as a result of Tenant's early occupancy of the Leased Premises within ten (10) days from Tenant's receipt of said demand. During said period of early occupancy, the provisions of Section 15, 22 and 24 shall prevail.

6.    Term

    (a)        Initial Term

        The initial term of this Lease shall commence on the day Tenant commences construction upon the Leased Premises or December 31, 1998, whichever first occurs ("Commencement Date") and shall terminate the tenth year thereafter ("Initial Term"), unless sooner terminated as provided herein.

    (b)        Option to Extend Term

        Tenant is granted the option to extend the Initial Term of this Lease for one (1) additional period of ten (10) years ("Renewal Term") on the same terms and conditions as provided herein. This option is granted, provided Tenant is not in default of the Lease at the time of exercise of the option. If Tenant should decide to exercise Tenant's option to extend, Tenant shall give written notice thereof to Landlord at least six (6) months before expiration of the then current term. The monthly rent for the any Renewal Term is set forth in Section 7c below.

7.    Rent

    (a)        Initial Term Rent

        Beginning within fifteen (15) days following the Commencement Tenant shall pay to Landlord, without prior notice or demand and without offset or credit, the sum of Two Thousand and 00/100 Dollars ($2,000.00) per month ("Rent") in advance on or before the first day of each and every calendar month during the Initial Term or the Renewal Term hereof.

    (b)        Pre-Construction Rent

        Notwithstanding the foregoing, the parties have agreed that commencing July 1, 1998, and until the Initial Term, tenant shall pay Seven Hundred Fifty and 00/100 Dollars ($750.00) per month ("Pre-Construction Rent"). Pre-Construction Rent during this period shall be payable in the same manner described above in 7(a). Tenant agrees to diligently pursue the permits necessary for construction.

    (c)        Base Rent Adjustment

        Rent shall be increased on each anniversary of the Commencement Date by an amount equal to five percent (5%) of the Rent in effect during the previous year.

    (d)        Extended Term Rent

        Commencing with the first day of the first year of any Extended Term, Tenant agrees to pay to Landlord the monthly rent which was payable by Tenant for the last month of the immediately preceding year increased, if any,

Exhibit 1

by any increase in the cost of living during the previous one year calculated by the method as recited in Section 7(c) above.

(e)      Prorated Rent

Rent for any period during the Initial Term or any Renewal Term hereof which is less than one (1) month shall be prorated based on a thirty (30) day month. All rentals payable hereunder shall be paid to Landlord at the address Landlord may from time to time designate in writing.

Tenant shall pay to Landlord, as herein provided, all other sums of which shall become due hereunder. Said sums shall be payable not later than thirty (30) days after Landlord renders Tenant a statement therefor.

## 8.   General Covenants

Upon Tenant paying the Rent for the Leased Premises and observing and performing all of the covenants, conditions and provisions on Tenant's part to be observed and performed hereunder, Tenant shall have quiet possession of the Leased Premises for the Initial Term or any Renewal Term hereof subject to all of the provisions of the Lease. Tenant shall not be held liable for reasonable use and wear and tear and/or damage caused by any casualty.

## 9.   Uses Permitted

Tenant shall use or permit the Leased Premises to be used for the purpose of operating a wireless radio telecommunications mobile telephone system, and shall not use or permit the use of the Leased Premises for any other purpose or by any other parties (except as permitted in Section 27 below) without obtaining the prior written consent of Landlord.

Tenant shall not do or permit anything to be done in or about the Leased Premises which will in any way increase the existing rate of fire or other insurance upon the Building or contents or cause cancellation of any insurance policy covering said Building or contents. Tenant shall not do or in any way obstruct or interfere with the rights of other tenants or occupants of the Building or injure or annoy them. Tenant shall not commit or suffer to be committed any waste in or upon the Leased Premises. Tenant shall fully comply with all health and police regulations and shall not use or permit the use of the Leased Premises for any purpose or in any manner which may constitute a violation of the laws of the United States or the laws, ordinances, regulations or requirements of any governmental entity having authority in the jurisdiction where the Leased Premises are located. Tenant acknowledges that no warranties or representations have been made regarding the fitness or suitability of the Leased Premises for the conduct of Tenant's business.

## 10.   Non-Interference

(a)      Tenant shall operate the Communications Facility in a manner that will not cause interference to Landlord and other Tenants or licensees of Landlord's Property, provided that their installations predate that of the Tenant Facilities. All operations by Tenant shall be in compliance with all Federal Communications Commission ("FCC") requirements.

(b)      Subsequent to the installation of the Communications Facility, Landlord shall not permit itself, its Tenants or licensees to install new equipment on Landlord's Property or property contiguous thereto owned or controlled by Landlord, if such equipment is likely to cause interference with Tenant's operations. Such interference shall be deemed a material breach by Landlord. In the event interference occurs, Landlord agrees to take all action necessary to eliminate such interference, in a reasonable time period. In the event Landlord fails to comply with this paragraph, Tenant may terminate this Lease and/or pursue any other remedies available under this Lease, at law, and/or at equity.

## 11.   Signal Blockage

Tenant is leasing the Leased Premises for the purpose of transmitting and receiving telecommunications signals from the Landlord's building. Tenant and Landlord recognize that the purpose behind the Lease would be frustrated if the telecommunication signals were partially or totally blocked or if an obstruction were built that would cause interference with such transmission. The obstruction may be, by way of example, but not limited to: buildings or other structures in the path of the telecommunications

Exhibit 1

signal or situated in such a way so as to cause interference with the telecommunication signal. Should an obstruction occur, Tenant agrees to make a legitimate effort to alter the antennas, with Landlord's approval, to correct the situation. If no commercially feasible alternative exists, Tenant shall have the right to terminate this Lease pursuant to Section 12 below.

12.    Termination

Tenant shall have the right to terminate this Lease upon any of the following events:

(a)    If the approval of any agency, board, court, or other governmental authority necessary for the construction and/or operation of the communications equipment cannot be obtained, or is revoked, or if Tenant determines the cost of obtaining such approval is prohibitive; or

(b)    If Tenant determines at any time that the Leased Premises are not appropriate under Tenant's design or engineering specifications for its Communication Facility or the communications system to which the Communication Facility belongs.

Tenant will give Landlord thirty (30) days written notice of termination of this Lease under the terms of this Section 12(a) and (b). If Tenant terminates this Lease after the Commencement Date pursuant to subparagraph 12(b) above during the Initial Term, it shall pay to Landlord a sum equal to twelve (12) times then current rent as a fee for early termination. Upon termination, neither party will owe any further obligation under the terms of this Lease except for Tenant's responsibility of removing all of Tenant's communications equipment from the Leased Premises and restoring the Leased Premises to the condition in which it existed upon execution hereof, or as near as practicable, save and except normal wear and tear and acts beyond Tenant's control.

13.    Chase Rights

Tenant shall have the right to install cables and wires in and through the existing raceways, or other areas within and between the Leased Premises, including but not limited to the space and areas between Tenant's equipment and Landlord's roof, and the right to repair and maintain such cable and wires, including all necessary rights of access to effect such repairs and maintenance with Landlord's prior review and approval (except in the event of an emergency) and in a way which shall not disrupt the Building or interfere with its mechanical systems. Tenant shall give Landlord reasonable advance notice of any such repair and maintenance activities. Tenant shall use its best efforts to perform any such repair and maintenance during Landlord's normal business hours, except in an emergency, in a manner that will not interfere with Landlord's business operations.

14.    Alterations and Modifications

Tenant shall not make any alteration or modification to the Leased Premises after the commencement of the Lease without Landlord's written consent. Any alteration or modification that will create unreasonable noise or other disturbance at a level that interferes with existing tenants' use of the Building shall be performed after 6:00 P.M. and before 7:00 A.M., or on Saturday, Sunday, or a Holiday. Upon termination of the Lease term or any extension thereof, Tenant shall, at its sole cost and expense, remove all alterations, additions or improvements made by or for Tenant and repair any damages occasioned by such removal.
15.    Mechanic's Liens

Tenant shall keep the Leased Premises free and clear of all mechanic's or materialman's liens, resulting from construction done by or for Tenant.

16.    Title

Landlord warrants and represents that Landlord owns the Property in fee simple and has rights of access thereto and that there are no liens, encumbrances or exceptions to property title existing as of the date of this Lease that would interfere with Tenant's rights hereunder.

17.    Hazardous Materials

Landlord represents to the best of its knowledge and to and for the benefit of Tenant that (1) there are no known Hazardous Materials (defined below) located in, or on, or under the Leased Premises or the real property owned by the Landlord on which the Leased Premises form a part in such quantities or amounts to place the Landlord in a position of being in violation of any applicable

Exhibit 1

laws, and the Leased Premises and such real property, and all operations thereon, currently comply with all laws regarding Hazardous Materials ("Hazardous Materials Laws"), excluding therefore supplies used by contractors retained by Landlord to maintain, repair, or improve Landlord's Property, (2) no litigation has been brought or threatened, nor have any settlements been reached with any governmental or private party, concerning the actual or alleged presence of Hazardous Materials on or about the Leased Premises, or any disposal, release, or threatened release of Hazardous Materials in or about the Leased Premises before execution hereof, (3) Landlord has not received any notice of any violation, or any alleged violation of any Hazardous Materials laws on or about the Leased Premises. During the term of this Lease, Landlord will operate the property of which the Leased Premises form a part in material compliance with all Hazardous Materials Laws, and will suffer no violation of such laws by any other Tenant or Tenants of such property. If not in compliance, because of not knowing, upon finding out Landlord will take whatever steps are necessary to correct it.

In the event during the term of this Lease it is determined that the Leased Premises or real property owned by Landlord on which the Leased Premises form a part is contaminated by Hazardous Materials, Tenant shall have the right to terminate the Lease upon thirty (30) days written notice, unless Landlord is willing and able to correct the conditions within said thirty (30) day period. In the event Tenant is unable to operate the Communications Facility during the period of time Landlord is correcting the conditions it shall have the right to terminate this Lease. Tenant shall not use or store Hazardous Materials on the Leased Premises at any time except those which are used in the operation of the Communications Facility, under the following conditions:.

(a)     Tenant shall indemnify and hold Landlord harmless from any and all claims, losses, damages, costs and expenses (including attorneys' fees) arising out of or in any way related to the handling or storage of Hazardous Materials; provided, however, that Landlord shall indemnify and hold Tenant harmless from any claims, losses, damages, costs and expenses (including attorneys' fees) arising out of the presence on, beneath, or above the Leased Premises, as of the commencement date of the Lease, of Hazardous Materials, or from Hazardous Materials that may come to be located on, under, or above the Leased Premises after the Commencement Date by reason of the acts of Landlord, other tenants, or tenants of the real property of which the Leased Premises forms a part, or the agents or employees of either, if known to Landlord and Landlord fails to act prudently;

(b)     At all times, Tenant (i) shall comply with all federal, state and local laws, statutes, ordinances, and regulations of any kind relating to the use, storage, control, transportation, and disposal of such hazardous materials, (ii) shall obtain all necessary governmental approvals and permits with respect to such activities, (iii) shall fully and completely prepare and shall file all required inspections with respect to the same, and (iv) shall supply to Landlord evidence of compliance with this Section 17 in a form and substance satisfactory to Landlord upon Landlord's request therefore.

As used herein, "Hazardous Materials" shall mean:

(1)     "Hazardous substances," and "pollutants or contaminants" as defined in CERCLA 42 USC §9601(14) and (33) and regulations issued pursuant thereto;

(2)     "Extremely hazardous substances," "hazardous chemicals," and "toxic chemicals" as defined in the Emergency Planning and Community Rights to Know Act, 42 USC §11002(a), 11021(e), and 11023(c), and regulations issued pursuant thereto;

(3)     "Hazardous chemicals" within the meaning of OSHA's Hazard Communication Rules, 29 CFR §1910.1200;

(4)     Any such materials regulated under state or local environmental laws and regulations similar to the foregoing federal authorities listed in (1) – (3) above; and

(5)     Any materials not covered by, or exempted from, the sources listed in Paragraphs (1) – (4) above, that may nevertheless pose a threat to human health or welfare or to the environment including, without limitation, petroleum, including crude oil or any fraction thereof, and radon.

Exhibit 1

18.   Subordination.

This Lease shall, at the option of Landlord, be subject and subordinate to the lien of any and all mortgages, deeds of trust or ground or underlying leases now or that may at any time hereafter be placed upon the Premises or Building, and to any agreement at any time made modifying or supplementing any such mortgage, deed of trust or ground or underlying lease, provided however, that Tenant's leasehold interest shall continue in full force and effect upon any default of Landlord or foreclosure under any mortgage, deed of trust or ground or underlying lease. Tenant shall, upon the request of Landlord, execute and deliver such further instruments evidencing the subordination to any ground or underlying lease as may be desired by a mortgagee, beneficiary, or Lessor. Landlord shall, upon the request of Tenant, obtain a non-disturbance agreement from each person or entity that holds a ground lease mortgage, mortgage deed of trust, or other lien or encumbrances subordinate to this Lease.

19.   Estoppel Certificates.

Tenant shall from time to time upon at least fifteen (15) days prior written notice from Landlord, execute, acknowledge and deliver to Landlord a statement in writing (a) certifying that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease as so modified is in full force and effect) and the date to which the rental and other charges, if any, have been paid, and (b) acknowledging that there are not, to Tenant's knowledge, any such defaults if any are claimed. Any such statement may be relied upon by any prospective purchaser or encumbrancer of the Building or the Leased Premises.

20.   Utilities and Services.

   (a)      Landlord acknowledges it is imperative that Tenant have unrestricted access to the Leased Premises. Access to the Leased Premises shall be available to Tenant, Tenant's employees and invitees 24 hours a days, 365 days per year.

   (b)      Tenant shall make arrangements for and install a submeter in the Building's electrical room to measure the amount of electricity consumed by Tenant. The cost of such meters and installation, maintenance, repair thereof, and power usage shall be paid for by Tenant.

   (c)      Except in an emergency, or events out of the reasonable control of Landlord, Landlord shall give Tenant at least forty eight (48) hours prior notice of any repairs or alterations that will result in the stopping of electric service to the Leased Premises during the period Landlord is performing any repairs, alterations or improvements. Landlord shall not be liable for any such failure of electrical service or for any inability to furnish such service by reason of any cause beyond its control, but in case of such failure, Landlord will take all reasonable steps to restore the interrupted service.

   (d)      Tenant shall have the right to install and maintain, at its own cost and expense, a self-contained, air-conditioning system and a halogen fire protection system on the Leased Premises .

   (e)      Tenant may operate, at its own expense and in accord with existing federal, state and city codes, an emergency portable gasoline, diesel or other fuel power generator ("Generator"). The Generator shall be placed in a location acceptable to Landlord on the ground level of the Building or parking garage or lot. A Generator will be used only during electrical service outage or similar emergencies.

21.   Personal Property Taxes.

Tenant shall pay when due all taxes levied on Tenant's personal property, including but not limited to equipment, trade fixtures and furnishings located in or on the Leased Premises, and any increase in real property taxes caused by Tenant's use, improvements, additions or modifications to the property on which the Leased Premises is located in connection with this Lease upon receipt of sufficient documentation of Tenant's pro rata share of real property taxes.

22.   Liability and Indemnification.

Tenant agrees to indemnify and save the Landlord harmless from all claims (including costs and expenses of defending against such claims) arising or alleged to arise from any act or omission of Tenant or Tenant's agents, employees or contractors occurring during

the term of this Lease in or about the Leased Premises . Tenant agrees to use and occupy the Leased Premises at its own risk and hereby releases Landlord, its agents and employees, from all claims for any damage or injury brought on by Tenant to the full extent permitted by law. Landlord in turn agrees to indemnify and save Tenant harmless from all claims, (including cost and expenses of defending against such claims) arising or alleged to arise from any act or omission of Landlord or Landlord's agents, employees, contractors or other tenants of Landlord occurring during the term of this Lease.

The foregoing indemnity shall not relieve any insurance carrier of its obligations under any policies required to be carried by either party pursuant to this Lease to the extent that such policies cover the period or occurrence that results in the claim that is subject to the foregoing indemnity.

23.    Maintenance and Repair.

During the term of this Lease, Tenant shall, at Tenant's cost and expense, keep and maintain the Leased Premises and the fixtures therein in good order and repair, ordinary wear and tear and damage from any casualty excepted, and shall make all repairs thereto to the Leased Premises which shall be required as a result of any act or omission of Tenant, its agents, contractors, employees, or invitees. All such repairs shall be at least equal in quality to the original work. The alterations shall be performed in a manner that will not interfere with the quiet enjoyment of other tenants in the Building in which the Leased Premises are located. If Tenant shall fail to keep and maintain the Leased Premises in good order and repair, Landlord may, at its option, after thirty (30) days of written notice to Tenant, complete such repairs. Tenant shall pay promptly the reasonable cost thereof as additional rent, upon receipt or written demand from Landlord evidencing Landlord's expenditures.

24.    Liability Insurance.

During the term of this Lease, Tenant shall, at Tenant's expense, obtain and keep in force a policy of comprehensive public liability insurance with policy limits not be less than $1,000,000 per injury and $5,000,000 per occurrence. The limit of said insurance shall not however, limit the liability of the Tenant hereunder. Tenant may carry such insurance under a blanket policy, provided, such insurance has a Landlord's protective liability endorsement thereon. If Tenant shall fail to procure and maintain said insurance, Landlord may, but shall not be required to, procure and maintain said insurance, at the expense of Tenant. Tenant shall deliver to Landlord certificates evidencing the existence and amounts of such insurance and naming Landlord as additional insured. No policy shall be cancelable or subject to reduction of coverage except after twenty (20) day's prior written notice to Landlord.

Tenant shall have the right to fulfill its insurance obligations under this Section 24 pursuant to self insurance, provided that Tenant shall satisfy all requirements of any applicable law, regulation or direction relating to self insurance and shall furnish proof of such.

25.    Damage or Destruction.

(a)         If the Building is destroyed to the extent of no less than twenty-five percent (25%) of the replacement cost thereof, either party may elect to terminate this Lease whether or not the Leased Premises are damaged, by giving written notice to the other within thirty (30) days following notice by Landlord of its determination of the extent of such damage or destruction. Total destruction of the Building shall automatically terminate this Lease. If the Lease is not terminated as provided herein, Landlord agrees to begin repairs as soon as reasonably possible, and to diligently proceed with such repairs. The work shall be commenced by Landlord within a reasonable time after the date upon which the extent of such damage or destruction has been determined by Landlord.

(b)         Landlord acknowledges and agrees that it is extremely important that Tenant maintain continuous operation of its radio systems on the Leased Premises. Therefore, in the event of any damage to or destruction of the Building or the Leased Premises, or any condemnation of them, which renders Tenant's systems inoperable or unusable, Tenant as hereinafter provided, shall have the right (subject to any requirements of law or governmental authority) to construct or install temporary facilities, including temporary or replacement antenna, if necessary, in or about the Leased Premises, and the Building, in such locations as may be reasonably acceptable to Landlord and in a manner which will not interfere with any repair or reconstruction efforts, in order to continue operation of its system. Landlord shall allow Tenant to install such additional equipment and fixtures, including antenna(s), cables and wires, and shall permit Tenant such access, repair and maintenance rights as may be necessary to allow Tenant to operate and maintain such temporary facilities until the Leased Premises, and/or the Building have been sufficiently repaired to permit Tenant to use the system on the Leased Premises, or until a substitute permanent location acceptable to Landlord and Tenant has been agreed upon, and construction of such substitute permanent

facility has been completed. If the Lease is not terminated as provided herein, Landlord agrees to begin repairs as soon as possible and to diligently proceed with such repairs to completion.

(c)      If the Leased Premises and the Building are repaired or reconstructed, Tenant shall thereafter have the right to construct or install a replacement system, including all antenna(s), cables, conduits, poles, wires and electronic or other equipment, in and on the repaired or reconstructed Leased Premises, and Building in substantially the same location and manner as prior to the occurrence of the damage. It is the intention of the parties hereto that Tenant shall be able to maintain continuous operation and use the system throughout the Term of this Lease, including all extensions, at the same or substantially the same site where the Leased Premises are currently located.

(d)      If Tenant elects to continue operation of the system pursuant to this Section 25, this Lease shall not terminate on account of such damage, destruction or condemnation, but shall continue in effect. Rent and Tenant's other obligations under the Lease shall be equitably abated or adjusted to account for any damage, destruction or reduction of the Leased Premises or the conditions which under Tenants' temporary or replacement facilities are being used and operated, commencing from the date of damage and continuing during the period of such repair, reconstruction and restoration. Tenant shall not be entitled to any other compensation or damages from Landlord for loss of use of the Leased Premises or any part thereof, or for any other loss resulting from such damage, repair, reconstruction or restoration.

(e)      Notwithstanding anything to the contrary contained in this provision, Landlord shall have no obligation whatsoever to repair, reconstruct or restore the Leased Premises when the damage or destruction occurs during the last twelve (12) months of the last Extended Term hereof.

26.   Rights on Default.

(a)      Tenant's Default. If Tenant fails to perform any obligation under this Lease for the payment of money within fifteen (15) days after receipt of written notice from Landlord specifying the payment due, or thirty (30) days for any other obligation, then unless Tenant promptly commences to rectify or rectifies the default, Landlord may, at its option, upon written notice to Tenant, take any or all of the following actions:

     (i)      Perform any such obligation, in which event the cost and any expenses incurred thereof becomes immediately due and payable to Landlord as additional rent; or

     (ii)      Terminate this Lease.

If the nature of Tenant's default is such that more than thirty (30) days are reasonably required for its cure, then Tenant shall not be in default if Tenant shall commence such cure within said thirty (30) day period and thereafter diligently prosecute such cure to completion.

(b)      Landlord's Default. Landlord shall not be considered to be in default under this Lease unless (i) Tenant has given notice specifying the default and (ii) Landlord has failed for thirty (30) days to cure the default, if it is curable, or to institute and diligently pursue reasonable corrective acts for defaults that cannot be reasonably cured within thirty (30) days. In the event Landlord fails to rectify said default, Tenant may take any of the following actions:

     (i)      Perform any such obligation under this Lease, in which event the reasonable and customary cost and any expenses incurred therefrom become immediately due and payable to Tenant; or

     (ii)      Terminate this Lease.

27.   Assignment and Subletting by Tenant.

(a)      Tenant may not assign, or otherwise transfer all or any part of its interest in this Agreement or in the Leased Premises without the prior written consent of Landlord; provided, however, that Tenant may assign its

Exhibit 1

interest to its parent company, any subsidiary or affiliate of it or its parent company or to any successor-in-interest or entity acquiring fifty-one percent (51%) or more of its stock or assets, subject to any financing entity's interest, if any, in this Agreement as set forth in Paragraph 45 below

(b)       . Landlord may assign this Agreement upon written notice to Tenant, subject to the assignee assuming all of Landlord's obligations herein, including but not limited to, those set forth in Paragraph 45 below. Notwithstanding anything to the contrary contained in this Agreement, Tenant may assign, mortgage, pledge, hypothecate or otherwise transfer without consent its interest in this Agreement to any financing entity, or agent on behalf of any financing entity to whom Tenant (i) has obligations for borrowed money or in respect of guaranties thereof, (ii) has obligations evidenced by bonds, debentures, notes or similar instruments, or (iii) has obligations under or with respect to letters of credit, bankers acceptances and similar facilities or in respect of guaranties thereof. No assignment shall operate to release Tenant of its obligations hereunder.

(c)       Except as provided in Section 27(a) above, Tenant shall not voluntarily or by operation of law assign, transfer, mortgage, sublet, or otherwise transfer or encumber all or any part of Tenant's interest in the Lease or in the Leased Premises, without Landlord's prior written consent which consent shall not be unreasonably withheld, delayed or conditioned.

28.    <u>Notices</u>.

All notices or demands are deemed to have been given or made when delivered in person or delivered by certified, return receipt requested, postage prepaid, United States mail, addressed to the respective parties as follows:

Landlord:
Diversified Equity Holdings L.P.
1299 4th Street, Suite 202
San Rafael, CA 94901
Attn: Jack Krystal
Phone: (415) 457-2800

Tenant:
Nextel of California, Inc.
475 14th Street, Suite 200
Oakland, CA 94612
Attn.: Property Administrator

With a copy to:
Nextel Communications, Inc.
1505 Farm Credit Drive
McLean, VA 22102
Attn.: Legal Dept., Contracts Manager

The address to which any notice or demand may be given to either party may be changed by written notice.

29.    <u>Changes</u>.

In the event of any sale or transfer by Landlord of the Leased Premises or the Building and assignment of this Lease by Landlord, Landlord shall be and is hereby entirely freed and relieved of any and all liability and obligations contained in or derived from this Lease arising out of any act, occurrence, or omission relating to the Leased Premises or this Lease occurring after the consummation of such sale or transfer, provided the purchaser shall expressly assume all of the covenants and obligations of Landlord under this Lease. If any security deposit or prepaid rent has been paid by Tenant, Landlord shall transfer the security deposit or prepaid rent to Landlord's successor and upon such transfer, Landlord shall be relieved of any and all further liability with respect thereto.

30.    <u>Voluntary Surrender</u>.

No surrender or act of surrender of the Leased Premises and no agreement to accept such surrender shall be valid unless expressly stated in writing and signed by Landlord. The voluntary surrender of this Lease by Tenant or a mutual cancellation thereof shall not work a merger and shall, at the option of Landlord, terminate all or any existing subleases or subtenancies to be performed or observed by Tenant hereunder.

Exhibit 1

31. <u>Time of the Essence</u>.

Time is of the essence of this Lease and of each covenant, term and condition hereof.

32. <u>Rules of Construction</u>.

This Lease is to be construed as a whole, according to its fair meaning, and not strictly for or against either Tenant or Landlord. The Section headings are for convenience only and are not a part of this Lease and do not limit or amplify its provisions. The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

33. <u>Binding on Successors</u>.

This Lease is binding on and will inure to the benefit of the respective successors and assigns of Landlord and Tenant.

34. <u>Attorney Fees and Costs</u>.

In any action or proceeding instituted by either party for the purpose of determining or enforcing rights hereunder, the prevailing party shall be entitled to recover all expenses reasonably incurred, including court costs and reasonable attorney fees as determined by the court.

35. <u>Holding Over</u>.

Should Tenant, with Landlord's consent, hold possession of the Leased Premises or any portion thereof after the date upon which the Leased Premises are to be surrendered, Tenant will become a tenant on a month-to-month basis upon all the terms, covenants and conditions of this Lease. During any such month-to-month tenancy, Tenant shall pay monthly Rent in the amount which was payable by Tenant during the immediately preceding month, and such month-to-month tenancy shall be subject to all provisions of this Lease except those pertaining to the Lease term, and that rent shall be one hundred twenty five percent (125%) of the rent payable immediately preceding the termination date of the Lease. Tenancy will continue from month to month until terminated by Landlord or Tenant by giving of thirty (30) days written notice to the other. Nothing in this Section is to be construed as a consent by Landlord to the occupancy or possession of the Leased Premises by Tenant after the expiration of the term.

36. <u>Entry by Landlord</u>.

    (a)    Except in the event of emergency, neither Landlord nor Landlord's agents shall enter the Leased Premises except upon not less than twenty-four (24) hours notice to Tenant and during Landlord's normal business hours, and only when an agent or employee of Tenant is present on the Leased Premises .

    (b)    Landlord agrees that entry will be made with minimum interference with Tenant's use of the Leased Premises, Landlord shall have a key to the Leased Premises in order to permit entry thereto in the event of an emergency. Landlord shall restrict access to such key to Landlord's Building Manager or his or her designee. Landlord shall be responsible for all damages, including consequential damages; in the event the Communications Facility is damaged or becomes non-operational due to Landlords gross negligence or willful misconduct while within the Leased Premises. Landlord shall not be responsible if it acted in a prudent manner to cure an emergency situation. The Leased Premises shall be keyed to match Landlord's master key system.

37. <u>Landlord's Consent</u>.

Whenever the consent, permission, or approval of Landlord is required under this Lease, Landlord shall not unreasonably withhold or delay such consent, permission or approval, provided such consent or approval is not contrary to Landlords business interest or prejudicial to the building.

38. <u>Waiver of Subrogation</u>.                                            ~~DELT~~

~~Landlord waives as against Tenant, and Tenant waives as against Landlord, any and all claims and demands for damage, loss or~~ injury to the Leased Premises, or to Tenant's furnishings, ~~furniture, business machines, equipment~~ and other property in and upon ~~the Leased Premises and the building in which the Leased Premises are located, which damage results from fire and other perils,~~

~~events or happenings to the extent covered by insured and the parties shall cause insurance policies obtained by each of them to~~ provide that the insurance company waives all rights of recovery by way of subrogation against the other in connection with any ~~damage covered by any policy.~~

PELE NW

39.     Memorandum of Lease.

Following the execution of this Lease, either party at its sole expense, shall be entitled to file a "short form" Memorandum of Lease in the form attached hereto as Exhibit D.

40.     No Waiver.
If either party fails or neglects to take advantage of any term hereof, such failure will not be a waiver of any covenant, term or condition of this Lease or the performance hereof.

41.     Condemnation of Leased Premises.

Should all or any part of said Leased Premises be taken by any public or quasi-public agency or entity under the power of eminent domain during the term of this Lease:

(a)         Either Landlord or Tenant may terminate this Lease by giving the other thirty (30) days written notice of termination.

(b)         Any or all damages and compensation awarded or paid because of the taking shall belong to the Landlord, except for amounts paid Tenant for moving expenses or for damage to any personal property or trade fixtures owned by Tenant and loss of business goodwill and the value of the unexpired term of this Lease.

(c)         Should only a portion of the Leased Premises be taken by eminent domain and neither Landlord nor Tenant terminates this Lease, the rent thereafter payable under this Lease shall be abated proportionally as to the portion taken which is then not usable by Tenant.

(d)         Tenant reserves its right under Section 25 to relocate its facility.

42.     Governing Law.

This Lease shall be governed by the laws of the State of California.
43.     Quiet Possession.

Upon Tenant paying the rent for the Leased Premises and observing and performing all of the covenants, conditions and provisions on Tenant's part to be observed and performed hereunder, Tenant shall have quiet possession of the Leased Premises for the entire term hereof subject to all the provisions of the Lease.

44.     Entire Agreement and Binding Effect.

This Lease and any attached exhibits signed or initialed by the parties constitute the entire agreement between Landlord and Tenant; no prior written nor prior, contemporaneous or subsequent oral promises or representations shall be binding. This Lease shall not be amended or changed except by written instrument signed by both parties hereto.

45.     Waiver of Landlord's Lien.

(a)         Landlord waives any lien rights it may have concerning the Tenant Facilities which are deemed Tenant's personal property and not fixtures, and Tenant has the right to remove the same at any time without Landlord's consent. In the event Tenant removes the Tenant Facilities from the Leased Premises and does not terminate this Lease, it shall maintain the Leased Premises in a condition as if operational; otherwise the Leased Premises shall be put in the condition in which it existed upon the Commencement Date hereof.

(b)         Landlord acknowledges that Tenant has entered into a financing arrangement including promissory notes and financial and security agreements for the financing of the Tenant Facilities (the "Collateral") with a third party

Exhibit 1

financing entity (and may in the future enter into additional financing arrangements with other financing entities). In connection therewith, Landlord (i) consents to the installation of the Collateral; (ii) disclaims any interest in the Collateral, as fixtures or otherwise; and (iii) agrees that the Collateral shall be exempt from execution, foreclosure, sale, levy, attachment, or distress for any Rent due or to become due and that such Collateral may be removed at any time without recourse to legal proceedings.

46.   Building Rules and Regulations.

Except where inconsistent with the provisions of the Lease or any attached Exhibits, Tenant shall observe and abide by the Rules and Regulations of the Building, as set forth in Exhibit "C."

47.   Late Charge.

Any monetary obligations of Tenant which are unpaid for more than ten (10) days from the date due shall be subject to a late charge of five percent (5%) of the amount overdue. Any sum not paid within thirty (30) days after the due date shall bear interest on said amount from the date due until paid, at the rate of twelve percent (12%) per year.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the date and year first above written.

LANDLORD:

Diversified Equity Holding L.P., a California
Limited Partnership

By:   Diversified Realty Services
      A California Corporation

By:
      Jacob Krystal
      President

Date:   3-31-1998

Tax I.D. #: ████████

TENANT:

Nextel of California, Inc.,
a Delaware corporation,
d/b/a Nextel Communications

By:

**BILL JARVIS**

Date:   MAR 31 1998

Title:   PRESIDENT
         NO. CALIFORNIA MARKET

Exhibit 1

## EXHIBIT A

### DESCRIPTION OF LAND

to the Agreement dated ___March 31___, 1998, between NEXTEL OF CALIFORNIA, INC., a Delaware corporation, d/b/a Nextel Communications, ("Tenant"), and DIVERSIFIED EQUITY HOLDINGS L.P., a California Limited Partnership ("Landlord").

All that certain real property situate in the City of San Rafael, County of Marin, State of California, described as follows:

**PARCEL ONE:**

BEGINNING at the Northeasterly corner of Lot No. 12 in Block No. 19 of the Townsite of San Rafael, as the same is shown on the plat of said Townsite, filed and recorded in the County Recorder's Office of Marin County on the 14th day of October, 1873, said point being on the Southerly line of Fourth Street; running thence Westerly along the Southerly line of Fourth Street 26 feet and 10 inches; thence Southerly at right angles to Fourth Street, 55 feet, 5 inches to the Northerly line of Lot 11 in Block 19 of said Townsite, as shown on said map; thence Southerly at right angles, to said lot line, 5 feet; thence Easterly parallel with said lot line 26 feet and 10 inches to the East line of said Lot 11, thence Northerly along the East lines of said Lots 11 and 12, 60 feet to the point of beginning.

BEING portions of Lots 11 and 12, as shown on said map.

**PARCEL TWO:**

BEGINNING on the North line of Lot 12, in Block 19, as shown on the map of "Townsite of San Rafael", filed October 14, 1873 in the office of the County Recorder of Marin County, distant Westerly thereon, 26 feet and 10 inches from the Northeast corner thereof, said point being in the Southerly line of Fourth Street, as shown on said map; thence Southerly at right angles to Fourth Street, 55 feet, 5 inches to the Northerly line of Lot 11 in Block 19 of said Townsite, as shown on said plat; thence Southerly at right angles to said lot line 5 feet, thence Easterly, parallel with said lot line 26 feet and 10 inches to the East line of said Lot 11; to the point distant Southerly thereon, 5 feet from the Northeast corner thereof; thence Southerly along the East lines of Lots 11 and 10, 59 feet; thence Westerly along a line parallel with the North line of said Lot 10, 80 feet to the West line thereof, also being the East line of "C" Street, thence Northerly along the East line of "C" Street 120.5 feet, to the South line of Fourth Street; thence Easterly along the South line of Fourth Street, 51 feet and 10 inches to the point of beginning.

BEING the North 1/2 of Lot 10 and portions of Lots 11 and 12 in Block 19, as shown on said map.



INITIALS

Exhibit 1

## EXHIBIT B

### DESCRIPTION OF PREMISES

to the Agreement dated _March 31_, 1998, between NEXTEL OF CALIFORNIA, INC., a Delaware corporation, d/b/a Nextel Communications, ("Tenant"), and DIVERSIFIED EQUITY HOLDINGS L.P., a California Limited Partnership ("Landlord").



**Notes:**

1. This Exhibit may be replaced by a land survey of the Premises once it is received by Lessee.
2. Setback of the Premises from the Land's boundaries shall be the distance required by the applicable governmental authorities.
3. Width of access road shall be the width required by the applicable governmental authorities, including police and fire departments.
4. The type, number and mounting positions and locations of antennas and transmission lines are illustrative only. Actual types, numbers, mounting positions may vary from what is shown above.
5. The location of any utility easement is illustrative only. Actual location shall be determined by the servicing utility company in compliance with all local laws and regulations.

Exhibit 1

## EXHIBIT C

### RULES AND REGULATIONS

to the Agreement dated _____March 31_____, 1998, between NEXTEL OF CALIFORNIA, INC., a Delaware corporation, d/b/a Nextel Communications, ("Tenant"), and DIVERSIFIED EQUITY HOLDINGS L.P., a California Limited Partnership ("Landlord").

Please see attached



# EXHIBIT C

## RULES AND REGULATIONS

1. No sign, placard, picture, advertisement, name or notice shall be inscribed, displayed or printed or affixed on or to any part of the outside or inside of the Building or the Premises without the written consent of Landlord first had and obtained and Landlord shall have the right to remove any such sign, placard, picture, advertisement, name or notice without notice to and at the expense of Tenant.

All approved signs or lettering on doors shall be printed, painted, affixed or inscribed at the expense of Tenant by a person approved by Landlord.

Landlord shall not place anything or allow anything to be placed near the glass of any window, door, partition or wall which may appear unsightly from outside the Premises; provided, however, that Landlord is to furnish and install a building standard window covering at all exterior windows.

2. No Tenant shall obtain for use upon the Premises, ice, drinking or bottled water, towel or other similar service or accept barbering or bootblacking services on the Premises, except from persons authorized by the Landlord and at the hours and under regulations fixed by the Landlord.

3. The bulletin board or directory of the Building will be provided exclusively for the display of the name and location of Tenant only and Landlord reserves the right to exclude any other names therefrom.

4. The sidewalks, halls, passages, exits, entrances, elevators and stairways shall not be obstructed by any of the tenants or used by them for any purpose other than for ingress and egress from their respective Premises. The halls, passages, exits, entrances, elevators, stairways, balconies and roof are not for the use of the general public and the Landlord shall in all cases retain the right to control and prevent access thereto by all persons whose presence in the judgment of the Landlord shall be prejudicial to the safety, character, reputation and interests of the Building and its tenants, provided that nothing herein contained shall be construed to prevent such access to persons with whom the Tenant normally deals in the ordinary course of Tenant's business unless such persons are engaged in illegal activities. No tenant and no employees or invitees of any tenant shall go upon the roof of the Building.

5. Tenant shall not alter any lock or install any new or additional locks or any bolts on any door of the Premises without the written consent of Landlord.

6. The toilet rooms, urinals, wash bowls and other apparatus shall not be used for any purpose other than that for which they were constructed and no foreign substance of any kind whatsoever shall be thrown therein and the expense of any breakage, stoppage or damage resulting from the violation of this rule shall be borne by the Tenant who, or whose employees or invitees shall have caused it.

7. Tenant shall not overload the floor of the Premises or mark, drive nails, screw or drill into the partitions, woodwork or plaster or in any way deface the Premises or any part thereof. No boring, cutting or stringing of wires or laying of linoleum or other similar floor coverings shall be permitted except with the prior written consent of the Landlord and as the Landlord may direct.

8. No furniture, freight or equipment of any kind shall be brought into the Building without the consent of Landlord and all moving of the same into or out of the Building shall be done at such time and in such manner as Landlord shall designate. Landlord shall have the right to prescribe the weight, size and position of all safes and other heavy equipment brought into the Building and also the times and manner of moving the same in and out of the Building. Safes or other heavy objects shall, if considered necessary by Landlord, stand on wood strips of such thickness as is necessary to properly distribute the weight. Landlord will not be responsible for loss of or damage to any such safe or property from any cause and all damage done to the Building by moving or maintaining any such safe or other property shall be repaired at the expense of Tenant. There shall not be used in any space, or in the public halls of the Building, either by any tenant or others, any hand trucks except those equipped with rubber tires and side guards.

9. Tenant shall not employ any person or persons other than the janitor of Landlord for the purpose of cleaning the Premises unless otherwise agreed to by Landlord. Except with the written consent of Landlord, no person or persons other than those approved by Landlord shall be permitted to enter the Building for the purpose of cleaning the same. Tenant shall not cause any unnecessary labor by reason of Tenant's carelessness or indifference in the preservation of good order and cleanliness. Landlord shall in no way be responsible to any Tenant for any loss of property on the Premises, however occurring, or for any damage done to the effects of any Tenant by the janitor or any other employee or any other person. Janitor service shall include ordinary dusting and cleaning by the janitor assigned to such work and shall not include cleaning of carpets or rugs, except normal vacuuming, or moving of furniture and other special services. Janitor service will not be furnished on Saturdays, Sundays, or Holidays or on nights when rooms are occupied after 6:00 P.M. Exterior Window cleaning shall be done only by Landlord, and only between 8:00 A.M. and 5:00 P.M.

10. Tenant shall not use, keep or permit to be used or kept any food or noxious gas or substance in the Premises, or permit or suffer the Premises to be occupied or used in a manner offensive or objectionable to the Landlord or other occupants of the Building by reason of noise, odors and/or vibrations, or interfere in any way with other tenants or those having business therein, nor shall any animals or birds be brought in or kept in or about the Premises or the Building. No Tenant shall make or permit to be made any unseemly or disturbing noises or disturb or interfere with occupants of this or neighboring Buildings or Premises or those having business with them whether by use of any musical instrument, radio, phonograph, unusual noise, or in any other way. No Tenant shall throw anything out of doors or down the passageways.

11. The Premises shall not be used for manufacturing or for the storage of merchandise except as such storage may be incidental to the use of the Premises for general office purposes. No Tenant shall occupy or permit any portion of his Premises to be occupied as an office for a public stenographer or typist, or for the manufacture or sale of liquor, narcotics, or tobacco in any form, or as a medical office, or as a barber shop or manicure shop. No Tenant shall advertise for laborers giving an address at the Premises. The Premises shall not be used for lodging or sleeping or for any illegal purposes.

~~12. Tenant shall not use or keep in the Premises or the Building any kerosene, gasoline or inflammable or combustible fluid or material, or use any method of heating or air conditioning other than that supplied by Landlord.~~

13. Landlord will direct electricians as to where and how telephone and telegraph wires are to be introduced. No boring or cutting for wires will be allowed without the consent of Landlord. The location of telephones, call boxes and other office equipment affixed to the Premises shall be subject to the approval of Landlord.

14. All keys to offices, rooms and toilet rooms shall be obtained from Landlord's Building Management Office and Tenant shall not from any other source duplicate, obtain keys or have keys made. The Tenant, upon termination of the tenancy, shall deliver to the Landlord the keys of the offices, rooms and toilet rooms which shall have been furnished or shall pay the Landlord the cost of replacing same or of changing the lock or locks opened by such lost key if Landlord deems it necessary to make such change.

15. No Tenant shall lay linoleum, tile, carpet or other similar floor covering so that the same shall be affixed to the floor of the Premises in any manner except as approved by the Landlord. The expense of repairing any damage resulting from a violation of this rule or removal of any floor covering shall be borne by the Tenant by whom, or by whose contractors, employees or invitees, the damage shall have been caused.

16. No furniture, packages, supplies, equipment or merchandise will be received in the Building or carried up or down in the elevators, except between such hours and in such elevators as shall be designated by Landlord.

17. On Saturdays, Sundays and legal holidays, and on other days between the hours of 6:00 P.M. and 8:00 A.M. the following day, the Building shall be closed and locked. Tenant agrees to lock the entry door upon entering and leaving during the times above when working on weekends or late nights. Tenants' guests or clients shall be met at building entrance and escorted to tenant's space after locking entry door during these "closed" hours. The Landlord shall in no case be liable for damages for any error with regard to the admission to or exclusion from the Building of any person. In case of invasion, mob, riot, public excitement, or

INITIALS

DEG

WJ

other commotion, the Landlord reserves the right to prevent access to the Building during the continuance of the same by closing the doors or otherwise, for the safety of the Tenants and protection of property in the Building and the Building. Landlord reserves the right to close and keep locked all entrance and exit doors of the Building on Sundays, Saturdays, legal holidays, and on other days between the hours of 6:00 P.M. and 8:00 A.M., and during such further hours as Landlord may deem advisable for the adequate protection of said Building and the property of its tenants.

18.   Tenant shall see that the doors of the Premises are closed and securely locked before leaving the Building and must observe strict care and caution that all water faucets or water apparatus are entirely shut off before Tenant or Tenant's employees leave the Building, and that all electricity shall likewise be carefully shut off, so as to prevent waste or damage, and for any default or carelessness Tenant shall make good all injuries sustained by other tenants or occupants of the Building or Tenant.

19.   Landlord reserves the right to exclude from the Building any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs, or who shall in any manner do any act in violation of any of the rules and regulations of the Building.

20.   The requirements of Tenant will be attended to only upon application at the Office of the Building. Employees of Landlord shall not perform any work or do anything outside of their regular duties unless under special instructions from the Landlord, and no employee will admit any person (Tenant or otherwise) to any office without specific instructions from the Landlord.

21.   No vending machine or machines of any description shall be installed, maintained or operated upon the Premises without the written consent of Landlord.

22.   Landlord shall have the right, exercisable without notice and without liability to Tenant, to change the name and the street address of the Building of which the Premises are a part.

23.   Tenant agrees that it shall comply with all fire and security regulations that may be issued from time to time by Landlord and Tenant also shall provide Landlord with the name of a designated responsible employee to represent Tenant in all matters pertaining to such fire or security regulations.

24.   Landlord reserves the right by written notice to Tenant, to rescind, alter or waive any rule or regulation at any time prescribed for the Building when, in Landlord's judgment, it is necessary, desirable or proper for the best interest of the Building and its tenants.

25.   Tenant's shall not disturb, solicit, or canvass any occupant of the Building and shall cooperate to prevent same.

26.   Without the written consent of Landlord, Tenant shall not use the name of the Building in connection with or in promoting or advertising the business of Tenant except as Tenant's address.

27.   Landlord shall furnish heat during the hours of 8:00 A.M. to 6:00 P.M. Monday through Friday.

Paragraph #12 above is hereby replace to read as follows:

12.   The Tenant shall not use or keep in the Premises or the Building any inflammable or combustible fluid or material except as listed below:

   Chemicals contained within the equipment cabinet:
      a.   Refrigerant which is used in a sealed system in the heat/air conditioning.
      b.   Acid based electrolyte (approximately 1.6 gallons) used in the lead acid batteries for back-up power.

   Chemicals used in construction:
      a.   Water based latex paint
      b.   Polyurethane caulking

   Chemicals used in the maintenance and servicing:
      a.   Industry standard cleaner for electronic components (approximately 1 gallon).



Exhibit 1

**EXHIBIT D**

**MEMORANDUM OF LEASE**

**CLERK:  Please return this document to:**
NEXTEL OF CALIFORNIA, INC.
475 14th Street, Suite 200
Oakland, CA  94612
Attn:  Property Administrator

     This Memorandum of Lease is entered into on this __day of _____, 199_, by and between DIVERSIFIED EQUITY HOLDINGS L.P., a California Limited Partnership, with an address of 1299 4ᵗʰ Street, Suite 202, San Rafael, CA 94901, (hereinafter referred to as "Lessor") and NEXTEL OF CALIFORNIA, INC., a Delaware corporation, d/b/a Nextel Communications, with an office at 475 14th Street, Suite 200, Oakland, CA  94612, (hereinafter referred to as "Lessee").

1. Lessor and Lessee entered into a Building Lease Agreement ("Lease") on the __day of _____ 1998, for the purpose of installing, operating and maintaining a radio communications facility and other improvements. All of the foregoing are set forth in the Lease.

2. The term of the Lease is for ten (10) years commencing on date Lessee begins construction of the Lessee Facilities or December 31, 1998, whichever first occurs ("Commencement Date"), and terminating on the tenth anniversary of the Commencement Date with one (1) option to renew for ten (10) years.

3. The Land which is the subject of the Lease is described in Exhibit A annexed hereto. The portion of the Land being leased to Lessee (the "Premises") is described in Exhibit B annexed hereto.

    **IN WITNESS WHEREOF**, the parties have executed this Memorandum of Lease as of the day and year first above written.

**LESSOR:**
DIVERSIFIED EQUITY HOLDINGS L.P.,
a California Limited Partnership

By: _____
    Jacob Krystal

Date: _____

Title: __President_____

**LESSEE:**
NEXTEL OF CALIFORNIA, INC.,
a Delaware corporation,
d/b/a Nextel Communications

By: _____

Date: _____

Title: _____

STATE OF _____

COUNTY OF _____

On _____, before me, _____, Notary Public, personally appeared _____ personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument, the person, or the entity upon behalf of which the person acted, executed the instrument.

    WITNESS my hand and official seal.

_____(SEAL)
Notary Public

My commission expires: _____

Exhibit 1

STATE OF _____

COUNTY OF _____

On _____, before me, _____, Notary Public, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument, the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

_____(SEAL)
Notary Public

My commission expires: _____

Exhibit 1



**Sprint**

*Together with NEXTEL*

**Sprint Nextel**
Mailstop: CASRMD0301
12657 Alcosta Blvd., Suite 300
San Ramon, CA 94583

July 24, 2008

Diversified Equity Holdings L.P.
1299 4th Street, Ste. 202
San Rafael, CA 94901
Attention: Jack Krystal

| **RE:** | **Agreement Renewal** |
|---|---|

**Nextel Site Reference:** CA0839-A-Mission San Rafael
**Property Address:** 1299 Fourth Street, Suite 504 & roof, San Rafael, CA 94901 Parcel # 011-255-27

Mr. Krystal;

Pursuant to Paragraph 6(b) of the Building Lease Agreement [the Agreement], dated Tuesday, March 31, 1998, between Diversified Equity Holdings L.P., a California Lim, as Landlord, and NEXTEL OF CALIFORNIA, INC., a Delaware corporation, d/b/a NEXTEL COMMUNICATIONS, as Tenant ; Nextel hereby provides courtesy notice that Nextel is exercising its right to extend the term of the Agreement for an additional term (2 Agreement Term - Renewal Option) from Thursday, January 1, 2009 through Monday, December 31, 2018.

Please feel free to contact me regarding any issues concerning the Agreement. You may reach me by phone at (925)904-3937 or via email at lisa.a.hickson@sprint.com. When communicating with our office, please refer to the Nextel site reference number (CA0839-A-Mission San Rafael).

Thank you for your cooperation and assistance.

Sincerely,
Sprint Nextel

Lisa Hickson
Real Estate Manager II

Exhibit 2



Mailstop KSOPHT0101-Z2650
6391 Sprint Parkway
Overland Park, KS 66251-2650
Toll Free: (800) 357-7641
Facsimile: (913) 523-9735
Email: LandlordSolutions@Sprint.com

September 9, 2013

**VIA CERTIFIED MAIL**
Tracking #: 7012 1640 0001 3336 3501

Diversified Equity Holdings, L.P.
1299 Fourth Street, Suite 202
San Rafael, CA 94901

| | | |
|---|---|---|
| Re: | Termination of Building Lease Agreement dated March 31, 1998 (the "Lease") | |
| | Owner: | Diversified Equity Holdings, L.P. |
| | Nextel: | Nextel of California, Inc., a Delaware corporation |
| | Nextel Site ID: | CA0839-A |
| | Site Address: | 1299 Fourth Street |
| | | San Rafael, CA |

Dear To Whom It May Concern:

Pursuant to Section 12b of the above-referenced Lease, this letter will serve as notice that Nextel is exercising its right to terminate the Lease, effective April 30, 2014 or the date Nextel vacates the site, whichever first occurs ("Termination Date"). In no event will the Termination Date be less than thirty (30) days after the date of this letter.

In the event that any filings of record made by Nextel are discovered that encumber your title to the above-referenced Site, Nextel will execute a Memorandum of Termination or otherwise reasonably cooperate in taking actions necessary to remove the encumbrance.

If you have any questions, please contact Jared Williams at 858-926-3896 or contact our toll-free Landlord Solutions team at 800-357-7641. When calling, please have the Nextel Site ID (above) available for reference.

Sincerely,

Leslie Baggenstos
Real Estate Manager

Exhibit 3